THE STATE OF OHIO, APPELLEE, *v.* DAVIS, APPELLANT. ■

[Cite as State v. Davis (1978), 60 Ohio App. 2d 355.]

(No. CA-77-3—Decided June 28, 1978.)

*Mr. Richard E. Bridwell,* special prosecuting attorney, and *Mr. David D. Guiley,* for appellee.

*Messrs: Graham & Graham* and *Mr. Thomas R. Bopeley,* for appellant.

PUTMAN, J.  In the summer of 1976, the Court of Common Pleas of Morgan County commenced an investigation into the conduct of the then duly elected, sworn and acting pro-

secuting attorney, Harry Donovan Lowe (hereafter Lowe). The Common Pleas Court appointed Muskingum County Prosecuting Attorney Richard E. Bridwell as "Special Prosecuting Attorney" to investigate. The judgment entry referred to R. C. 2941.63, which deals with assistants to the regular prosecutor to try pending cases.

Later, the court authorized the investigation to proceed into all public offices in Morgan County. The regular grand jury returned several indictments, one of which dated December 17, 1976, and signed "Richard E. Bridwell, Special Prosecuting Attorney," was a joint indictment against Lowe, and then welfare director James C. Davis, the appellant (hereafter Davis). The first count charged both with larceny by trick. (Covered in R. C. 2907.21 prior to 1974, and in R. C. 2913.02 after January 1974) spanning a period of time from August 6, 1970, until September 17, 1974, thereby attempting to straddle the January 1974 date of the change of the criminal law.

The second count also charged both Davis and Lowe with obtaining property (a lien release) by false pretenses (covered by R. C. 2911.01 prior to 1974, and covered by R. C. 2921.41 after that time) alleging violations during the period from June 4, 1970, to September 17, 1974, again attempting to straddle the time span of the change of the criminal law. The bill of particulars specified that the false representation was that one William Shaw was the grantee. The evidence was clear that this representation was made in 1970.

The third count charged Lowe, under the former law, with forgery on June 3, 1972 (R. C. 2913.01), having to do with the filing of a false grantee statement with the Morgan County auditor. That count is not involved in this appeal. The fourth count charged that Davis, on September 17, 1974 (contrary to R. C. 2913.42) did with intent to defraud falsify a "Statement of Grantee," a record kept by the Morgan County auditor. As a count four, the bill of particulars specified that William Shaw was falsely represented to be the grantor. In fact, Shaw was the grantor on the deed respecting which the tax on the transfer was to be paid.

An evidentiary hearing on a pretrial motion to dismiss the indictment, predicated on a failure to select the grand jury according to law, was held February 24, 1977, by a

visiting judge. That motion was overruled (erroneously we here hold) and a jury trial started July 18, 1977.

This then is Davis' appeal from his sentence following a conviction in a separate jury trial of all three counts against him.

The general subject matter was the acquisition by Davis of real property of a welfare recipient. Davis used a third person, one William Shaw, to conceal his identity as the real purchaser. The property was subject to a lien in favor of the Ohio Department of Public Welfare. Through a false pretense made in 1970, as to the identity of Davis as the real purchaser and subsequent representations by Davis who concealed his interest, the state transferred its lien to another property of lesser value.

Twenty-two errors are assigned. We sustain number fifteen which claims that the indictment is void because the grand jury was not selected according to law. That assignment, if correct, makes all others moot.

Dutifully responding to Appellate Rule 12 (A), we give reasons in writing as to our disposition of all assigned errors upon the premise *arguendo* that we are in error in sustaining assignment of error number 15.[1]

The facts center upon a real estate transaction, whereby Davis acquired title to a forty-nine acre farm situated in Malta Township, Morgan County, Ohio, through a conveyance executed and delivered in 1970, and the recording of the deed to Davis in September of 1974. During this period, Davis was the director of the Morgan County Welfare Department and Lowe was serving as Prosecuting Attorney for Morgan County. By virtue of such office, he was also the attorney for the Morgan County Welfare Department. Lowe was also the attorney for Glen Norris, who was the executor of the estate of his wife, Blanche Norris, deceased, until the death of Mr. Norris in 1970. Both Glen and Blanche Norris had been welfare recipients at the times of their respective deaths. Lowe was the attorney for the estate and for the survivor personally, as well as the attorney for the defendant, personally.

The 49 acre tract was acquired by Blanche Norris in

---

[1] Many are omitted from the published text for the sake of brevity.

1952. In 1962, both Glen and Blanche Norris were welfare recipients receiving aid-for-the-aged benefits and liens were executed by them, in favor of the State, which attached to the forty-nine acre farm. In 1968, Blanche Norris died and the following year Glen Norris was appointed executor of her estate. By 1970, the Welfare Director, Davis, was involved in attempting to secure the sale of the forty-nine acre farm and arrange for Mr. Norris to move into town, in the village of McConnelsville. In June 1970, both Davis and Lowe recommended to the state department of public welfare, by separate letters, that a private buyer was available for the farm and that Mr. Norris, who was in failing health, could then move into town and the lien on the farm could be transferred to the property in town. On July 28, 1970, Lot 37 was purchased in the village of McConnelsville for Mr. Norris for the sum of $4,700. On August 6, 1970, the Probate Court directed the sale of the forty-nine acre farm in Malta Township for the court appraised value of $6,000, and the transfer of the lien, then in the amount of $9,416.99. On that same day, Lowe contacted Mr. William Shaw, who had an office in Mr. Lowe's building, and induced him to sign a quitclaim deed to Davis. Mr. Norris died September 28, 1970.

The next public record pertaining to the real estate was an October 29, 1971, court order directing Glen Norris to proceed with the sale of the property and transfer of the lien. This was more than one year after his death.

On June 3, 1972, the transfer of the farm to William Shaw became a matter of public record by the filing of the "Grantee Statement," which showed a conveyance of the farm from the Blanche Norris Estate to William Shaw. On June 5, 1972, the administrator's deed, dated August 6, 1970, was received for recording. Finally on September 17, 1974, after the effective date of the new criminal code, a quit claim Deed, dated May 30, 1973, was received for recording, purportedly transferring the property from William Shaw to Davis. Mr. Shaw testified that this was the same deed signed by him in August 1970. The grantee statement filed by Davis bore that same date. It correctly stated that Shaw was the grantor.

Davis admitted that he was the actual purchaser of the property back in 1970 and claimed he was concealing this fact

from his wife because of marital problems. He further testified that he and Mr. Lowe had discussed the use of a "strawman" in 1970.

Mr. Joseph Acton, of the Ohio Department of Public Welfare, testified that despite the numerous correspondence with defendant in 1970 regarding the sale of the farm, he had never been advised that defendant was in fact the private purchaser and, if he had been so advised, he would never have approved the transaction. This was the false pretense specified in the bill of particulars to count two.

As a result, Davis acquired title to a forty-nine acre farm for $6,000, free and clear of any encumbrance. The lien, which was originally attached to the farm, in the amount of $9,416.99, was transferred to lot 37 in the village of McConnelsville, which had been purchased in 1970 for $4,700. The full nature of the transaction was discovered in July 1976, according to the prosecution.

*I.*

Both the first and fifteenth assignments of error complain of a single act by the trial court for the same basic reason. That act was the overruling of the motion to dismiss the indictment and the basis of the motion was that the indictment was void. Assignments of error one and fifteen merely give separate analyses to conclude that the indictment was void.

Defendant cites as authority the case of *State, ex rel. Thomas,* v. *Henderson* (1931), 123 Ohio St. 474. The claim is that, as in *Henderson,* the Common Pleas Court illegally "removed" the duly elected, qualified and acting Prosecuting Attorney for Morgan County without compliance with the applicable statute (now R. C. 309.05).

Based upon that premise, the argument states that the appointment of a special prosecuting attorney to have access to the grand jury (See Criminal Rule 6 [D] ) to the exclusion of the duly elected prosecuting attorney taints the grand jury proceedings and voids the indictment. See Criminal Rule 2, defining "Prosecuting Attorney."[2]

---

[2] " 'Prosecuting attorney' means the attorney general of this state, the prosecuting attorney of a county, the law director, city solicitor, or other officer who prosecutes a criminal case on behalf of the state or a city, village, township, or other

Separately, it is pointed out that Criminal Rule 7 (B) states:

"The indictment or the information *shall* be signed by the prosecuting attorney or signed *in his name* by an assistant prosecuting attorney***." (Emphasis added.)

The indictment was signed by Bridwell as "special prosecuting attorney," when the entry appointing him appointed him as an assistant to Lowe under R. C. 2941.63. Bridwell did not sign in Lowe's name or for him. The validity of the indictment at bar is a separate question from that of the authority of Bridwell to serve or be compensated as an assistant to Lowe.

In our written response sustaining assignment of error fifteen, we have "passed upon" and sustained the claim that the trial court erred in overruling the motion to dismiss the indictment. In so doing we reasoned that the indictment was void.

Having thus stated our "reason in writing," for our "passing upon" this "assigned error" (that the indictment was void), we consider our obligation under Appellate Rule 12 (A) not to include the expression of an opinion as to other reasons why the indictment is void.

## II.

Assuming *arguendo* that the indictment was valid, the trial court should have entered an acquittal as to count one. R. C. 2907.21, in effect in 1970, prohibited the obtaining of title to or possession of "anything of value by false or fraudulent representation, pretense, token, or writing." G. C. 12369, defining "anything of value," has been held not to include real estate under the rule of *ejusdem generis,* since the general words "every other thing of value" in the statute followed a designation of subjects, each and all of which were strictly personal property or property of a character which could, by severance, be removed from the real estate. *State* v. *Clark* (1938), 60 Ohio App. 367. Compare *State* v. *Toney* (1909), 81 Ohio St. 130, involving property by false pretenses.

The indictment under which the defendant was charged, tried and convicted, read in pertinent part:

---

political subdivision, and the assistant or assistants of any of them. As used in Rule 6, 'prosecuting attorney means the attorney general of this state, the prosecuting attorney of a county, and the assistant or assistants of either of them."

"[The accused] * * * unlawfully did obtain the possession of or title to certain property, to wit: real property of Blanche Norris by inducing said consent with the false and fraudulent representation. * * *"

The so-called larceny by trick statute has been interpreted as being limited to personal property.

Separately and additionally, the conveyance of the 49 acre tract came from a judicial (probate) sale. The appraisers were appointed by the Probate Court. The estate received the appraised value. The identity of the purchaser was irrelevant to the seller.

We hold that the first count of the indictment was not proved as a matter of law. The third assigned error is sustained.

We do not approve of the obvious conflict of interest nor do we rule out possible contempt of the Probate Court.[3] We merely hold that no crime was shown under count one of the indictment and the bill of particulars at bar.

### III.

We find that count two of the indictment, coupled with the bill of particulars, sufficiently alleged the obtaining of a release of a lien on real estate (property) by false pretense, in violation of former R. C. 2911.01, and therefore the trial court acted properly in overruling the motion to dismiss the count, again assuming *arguendo* that there was a valid grand jury indictment.

Defendant contends that count two of the indictment failed to negate the truth of the alleged false pretense. The second count was supplemented with a bill of particulars furnished to defendant. It specified that the accused falsely represented that William Shaw was the purchaser. Therefore, defendant was sufficiently apprised of the nature of the offense and his contention is without merit.

### IV.

Assignment of error number ten is sustained. As pointed out in the defendant's brief on appeal, arguments made to incite a jury to convict to meet a public demand are inimical to the basic rights of a defendant since they prevent him from

---

[3] See *In re Estate of Wright* (1956), 165 Ohio St. 15.

having a fair and impartial trial. The law contemplates that an accused should be convicted on the facts proven beyond a reasonable doubt. *State* v. *Agner* (1972), 30 Ohio App. 2d. 96; *State* v. *Cloud,* (1960), 112 Ohio App. 208. The state improperly made the following arguments to the jury, over an objection and motion to strike:

"You are going to answer a question as laymen, a question that you have to live with that you as citizens are here under subpoena under the Court as representatives of the taxpayers and voters in this county to answer. There is one question and your verdict will answer that question. That question is whether or not you want your public servants in this county to spread upon the records of this State Welfare Department, of the Probate Court, of the Auditor's Office, of the Recorder's Office and of the Treasurer's Office, false representation. If your answer to that is yes then you should vote for acquittal, but if you feel the public servant who takes an oath to uphold the law and the Constitution of the State of Ohio, that they cannot come in and give false papers and false exhibits to those offices, and your answer to this community is that they can't do that, and you are not going to stand for that in public office, then you will bring a verdict of guilty on all three charges."

Threatening the jury in a criminal case that they will be branded as condoning crime if they acquit an accused is never permissible. The jury is not on trial. The issue is not whether the jury approves of crime, but whether the evidence shows the accused is guilty of it under the law.

As stated by the U. S. Supreme Court in *Berger* v. *United States* (1935), 295 U. S. 78, 88:

"The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor—indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain

from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one. "It is fair to say that the average jury, in a greater or less degree, has confidence that these obligations, which so plainly rest upon the prosecuting attorney, will be faithfully observed. Consequently, improper suggestions, insinuations and, especially, assertions of personal knowledge are apt to carry much weight against the accused when they should properly carry none. * * *"

## V.

Assignments of error thirteen and fourteen are sustained. Both the indictment and the bill of particulars, as to count four, charged that the accused, *inter alia,* did falsify a writing.

R. C. 2913.42 (A), cited in the indictment, forbids persons under described circumstances to:

"(1) Falsify, destroy, remove, conceal, alter, deface, or mutilate any writing or record;

"(2) Utter any writing or record, knowing it to have been tampered with as provided in division (A) (1) of this section."

The amendment of the indictment and additional jury instructions relating thereto, after the conclusion of all the evidence, closing arguments, and charge to the jury, denied defendant due process of law respecting notice of the specific crime with which he was charged and to which he was required to direct a defense.

The state was permitted, over defendant's objection, to amend by adding the words "utter or" before the word "falsify" in count four of the indictment so that the amended count read: "That he did utter or falsify a writing or record." This added a separate act and crime beyond the crime of "falsifying" previously charged, and against which the defendant had prepared, directed and already concluded his defense.

Separately and additionally, it is our opinion that because the statement that Shaw was the grantor was the truth called for by this tax form, Davis is not guilty of count four as a matter of law.

## VI.

Assignment of error fifteen is sustained. We hold that it

was error for the Court of Common Pleas to deny defendant's motion to dismiss the indictment because the grand jury that returned such was improperly drawn and impaneled.

The Criminal Rules, effective July 1, 1973, authorize the filing of a motion to dismiss (Criminal Rule 6 (B) (2) ) an indictment based upon "objections to the array." "Challenges to the array" may be made by counsel for the defendant "on the ground that the grand jury***was not selected, drawn, or summoned in accordance with the statutes of this state." (Criminal Rule 6 (B) (1).)

We note that the adoption of the rules made no change in the statutory selection procedure for grand juries in Ohio. Grand juries are selected, drawn, notified and excused in the same manner as other jurors. R. C. 2939.03.

R. C. 2313.12 provides:

"The exemptions of jurors shall be such as are prescribed by sections 2313.01 to 2313.46, inclusive, of the Revised Code, and the general statutes of the state. The commissioners of jurors alone shall decide upon their qualifications and exemptions up until the time of notice of service, except as otherwise expressly provided in such sections; but the court may review and decide upon their qualifications and exemptions upon a written application and satisfactory legal proof at any time after they are notified and attend. The commissioners, upon request, shall issue to a person entitled to an exemption a certificate of that fact, which shall exempt the person to whom it is granted from jury duty during the time specified therein. Said commissioners shall keep a record of all proceedings before them or in their office, and of all persons exempted and the time and reasons for such exemptions."

From the evidence presented at the hearing held February 24, 1977, it is clear that the officials of Morgan County, Ohio, keep no record of persons excused or reasons for such excuse. This effectively prevents a judicial review of the jury selection process in Morgan County.

This affects a substantial constitutional right and where as here, it is timely raised and shown by the evidence, it voids the indictment and all proceedings thereon.

Under R. C. 2313.12 the jury commissioners alone have

the power to grant exemptions up to time of service. It is undisputed that the court administrator granted the exemptions in Morgan County and for such reasons as, for example, it would be easier to get service on the other person than it would be to gain service upon the juror excused.

R. C. 2313.16 provides:

"* * *[T]he court of common pleas shall not excuse a person, liable to serve as a juror and drawn and notified, unless it is shown by the *oath of the juror,* or if he is unable to attend, by the *oath of another person* acquainted with the facts, that:

(A) He is then necessarily absent from the county, and will not return in time to serve;

(B) The interests of the public, or of the juror, will be materially injured by his attendance;

(C) He is physically unable to serve;

(D) His wife, or a near relative of himself or his wife, has recently died or is dangerously ill.

"When a person liable to serve is excused, in a case specified in this section, or when a person notified to attend a term as a juror is entitled to and claims an exemption, he can be excused only by the judge presiding at the term which he has been notified to sttend. Such an excuse shall not extend beyond that term." (Emphasis added.)

R. C. 2313.17 provides:

"A person who has been notified to attend as a juror and who makes application to be excused as provided by section 2313.16 of the Revised Code, on the ground that he is not qualified, or is exempt, shall present his excuse in open court to the judge. If such person cannot personally attend, he shall send his excuse by a person capable of making the necessary proof in relation to his claim to be excused. A note of the excuse and of the reason therefor shall be made and attested by the court, and shall be transmitted to the commissioners of jurors by the clerk of the court of common pleas, as part of the return made, as prescribed in section 2313.01 to 2313.46 inclusive of the Revised Code."

Neither of these code sections were followed. Not only were people excused who informally requested to be excused but also those persons were excused who the court administrator "felt" could not or would not want to serve.

To prevent secret selection, the legislature has prescrib-

ed mandatory notice provisions respecting the drawing of jurors. They are contained in R. C. 2313.20 which states that the commissioners of jurors shall publish a notice that the drawing of jurors will occur at least six days before the drawing "in at least *two* newspapers of general circulation in the county." The commissioners also have a duty to serve written notice upon the clerk of the Common Pleas Court, the sheriff and the judge of the Common Pleas Court. A jury commissioner testified that she knew nothing of any notices whether in the newspapers or to the elected officials.

The notice was published only in the Morgan County Herald not withstanding the undisputed evidence that the Zanesville Times Reporter was also a newspaper of general circulation in the county at that time.

The special prosecutor in his brief asks us to judicially notice that Morgan County is "one of the least populated counties in this state." This is in aggravation not mitigation. Low population is not just cause for a lack of compliance with procedures for excusing jurors, nor does it prevent a keeping of a record thereof for judicial review.

No demonstration is made that any of the many statutory breaches are necessitated in any sense by the size of the county population. That condition is strong reason for compliance with the law and aggravates the prejudice resulting from breaches thereof. Specifically, the smaller the county the easier it is to defeat random selection and choose grand jurors biased against a suspect.

The accused has no obligation to demonstrate that such "stacking" in fact happened to him. The evil which must be avoided is the appearance that it *could* have happened.

It is naive to argue that such things could not happen in a small community. On the contrary, small numbers make stacking easier. The principle that the government can compel no one to stand trial for a felony except upon the accusation of a grand jury of his peers goes back to the year 1215 A.D. and is central to freedom from tyranny.

Practically speaking, this right depends upon random selection. Laws enacted by the legislature prohibiting arbitrary selection decisions by government functionaries are indispensible to this shield against the government. It is an understatement to say that substantial rights depend upon

them. Those who call such laws "technicalities" know nothing of history.

The record shows no substantial compliance with the statutory procedures for selecting the grand jury. The denial of the motion to dismiss the indictment was prejudicial error and therefore the entire proceedings must be vacated, including the indictment.

*Judgment reversed.*

RUTHERFORD, P. J., and DOWD, J., concur.

RUTHERFORD, P. J., concurring. Irrespective of whether the sustaining of any of the other assignments of error standing alone would require reversal, assignments of error 10 and 15, which are sustained, are of such magnitude as to mandate that the verdicts be set aside and that the sentences be vacated for the reasons set forth in the majority opinion.

The objection to the selection of the grand jurors was timely made prior to trial and should have been sustained.

The argument of the prosecutor that, "if you feel that a public servant who takes an oath to uphold the law and the Constitution of the state of Ohio, that they cannot come in and give false papers and false exhibits to those offices, and your answer to this community is that they can't do that, and you are not going to stand for that, in public office, then you will bring in a verdict of guilty on all three charges" commanded the jury to bring in a verdict of guilty if they did not stand for such conduct, rather than a verdict of "guilty" or "not guilty" as charged in the indictment based upon their determination made from the evidence and in accordance with the law.

Although the issue of the validity of the appointment of Richard Bridwell as special prosecutor has not been passed upon by the court, in my opinion, under the circumstances disclosed, the court did have the inherent judicial power to make the appointment for the limited purpose of this case.